Good morning and welcome to the Ninth Circuit. We are glad to be here with you and welcome those who are arguing virtually today. We have five cases set on the calendar to argue. We have two cases that have been submitted on the briefs. That's Carlos Amar Cruz Ramirez v. William Barr, case number 17-71346, and that case has been submitted. And second case on the calendar, Manpreet Singh v. William Barr, case number 17-72793 has also been submitted on the briefs. That brings us to the first case that we'll hear argument in today, and we'll take a short recess after hearing the first case. That case is Kimberley Janine Bentley v. Andrew Saul, case number 18-17443. That case has been set for 10 minutes argument per side, and counsel, you may proceed when you're ready. Thank you, your honor. May it please the court, good morning. I'm Robert Williams. I represent Kimberley Bentley, a 40-year-old woman who has been wrongfully denied her Title II benefits. She has borderline personality disorder, PTSD, ADHD, and various other mental impairments. She also has various physical impairments. This is a case where the ALJ not only got it wrong, the district court got it wrong, and I think that this is a case where everybody got it so wrong that the Ninth Circuit will find itself in a position that it will be considering remanding this case, not for rehearing, but for payment of benefits. Is it mostly an argument that they applied the wrong standard as to the treaty position's opinions? No, your honor, it goes far more than that. I mean, there was an absolute failure to recognize that there is more to it than that. The treating physicians were not properly credited, and in fact, there was no substantial evidence contradicting those treating physician opinions, and ultimately, with those opinions based on her mental impairments, both her primary care physician and her treating psychiatrist made the determination that she would miss sufficient numbers of day of work every month, that the vocational expert said she could not work. Did the state physician who gave the opinion, had he examined her? No, your honor, these are non-treating, non-examining physician opinions that were relied upon. Counsel, the non-treating physicians that were relied upon were contradictory to the treating physicians, is that correct? Their opinions were different, but the problem is that under Varney, I'm sorry, your honor, not Varney, but under Lester v. Chapper, which is long-standing 9th Circuit precedent, non-treating, non-examining physician opinions that are based upon the same records are insufficient to contradict the treating source. Well, I'm not so sure about that because we have this recent opinion that was just brought to our attention in the Ford case where we addressed Lester, and we didn't say, I mean, I think you're right that it's the normal course that we would look to the treating physicians, but as long as they provide, if there's contradictory evidence even by a non-treating physician, that the ALJ provides specific and legitimate reasons that are supported by substantial evidence in the record, even under Lester v. Chapper, we could affirm the ALJ. So is it your contention that there just was not a specific or legitimate reason that was given? That is indeed the case, is that there were not specific and legitimate reasons given here, particularly in connection with a treating psychiatrist. Here, the ALJ, and it's an ALJ, by the way, that is familiar with this particular doctor, failed to recognize that she had a treating psychiatrist who had diagnosed and signed off on a series of diagnoses of borderline personality disorder, PTSD, ADHD, and bipolar disorder. The, that, you know, based on his... Go ahead. We'll finish up, but I had a follow-up question. Go ahead. The ALJ, in considering that opinion, both failed to give it, just absolutely did not apply any of the six factors that you find in 404.1527C, just that he's not a psychiatrist, and I don't think it's consistent with the record in some vague and... Well, and the government seems to concede that there was an error, you know, in not using that, or discounting it, because the position of the ALJ was that it was not a mental health diagnosis, and it was a psychiatrist, but the question is, is that harmless, and was there enough other evidence? Can I ask a more basic question, because this is what troubled me a little bit about this case, is that it looked like Bentley produced medical records for a number of impairments, only some of which were addressed by the ALJ. Ulnar neuropathy was in the medical records, lesion of ulnar nerve, ADHD, PTSD, borderline personality disorder. Can you walk me through which of those, in your opinion, did the ALJ just not address at all, versus, you know, may have discounted or done something else with? Yeah, there is no evidence of the ALJ addressing any of the mental impairments other than bipolar, and the ALJ also did not address at all the ulnar neuropathy, and that is particularly significant in this case, because that was... She had surgery for it, and it was found to be unsuccessful surgery, so you don't send somebody back in to repeat a surgery that already hasn't worked. She, you know, there may be some argument that the commissioner could make that as to the carpal tunnel syndrome, that that was successful, but as to the ulnar neuropathy, no, it wasn't considered at all by the ALJ, and in fact, the medical records show that it was an unsuccessful surgery. And would that include the lesion of the ulnar nerve, or is that a separate issue that was considered? That would include that, I believe. And then your position is that ADHD... I'm sorry, Your Honor, and the lesion may have been corrected by surgery, but it didn't relieve the pain. Okay, and then borderline personality disorder, PTSD and ADHD, your position is none of that was considered because the ALJ just disregarded it, saying that there wasn't evidence to support it. No, the ALJ didn't do that. The district court did that. The district court made a number of arguments and a number of post-hoc rationalizations, which the court, I'm sure, is aware, on Brown v. Hunter, absolutely inappropriate. We looked at what the ALJ did. The ALJ just plain ignored things. The ALJ didn't make findings that these were non-severe. The ALJ didn't discuss them at all. You make an argument that her medication treatment belies a description of her as having conservative care. How many of the drugs were for psychosis conditions or depression, or were the dosages in the records sufficient to suggest that she had major problems that were being treated with these drugs? I believe so, Your Honor, and this also gets back to another one of the things the ALJ didn't do, which was consider some of the earlier doctors who were providing psychiatric treatment. But we do have an extensive footnote, and if my memory serves, I think it is about page 31, of the 13 different medications that she was taking, what they were being taken for. A large portion of those are ones that, certainly among the lower courts and the unreported decisions of the Ninth Circuit, belie any suggestion that this is conservative treatment. She had a long history of attempting medications that were unsuccessful or had substantial adverse side effects. Eventually, they settled on something, but at the end of the day, she has borderline personality disorder, and to the extent she's able to do anything, she's able to do that because she is home. She's not under stress. She's not in a work environment. And what both her primary care physician said and her treating psychiatrist said is that she cannot operate in a work environment successfully. Due to that stress, due to the nature of her personality, she's going to miss three to four days every month, which the vocational expert tells us makes it impossible for her to go forward. And then if we were to take even a look at the physical item of the ulnar neuropathy, we have an ALJ here saying she can return to her prior work. Well, the ulnar neuropathy means that she can't engage in repetitive motions. Both of the conditions or both of the prior items that were pointed to by the ALJ's past relevant work would be things that would require repetitive use of one of her upper limbs. So I think even there, you know, the ALJ's analysis failed. But what I think is fundamentally most important is once we get into the analysis of... Counsel, do you have any time for a rebuttal? I would like to, Your Honor. I've got about 30 seconds left. Then I will reserve my 30 seconds. Thank you, Your Honor. Thank you. Counsel, do we have the government's counsel on? Can you hear me? Oh, there we go. Ms. Bond? Thank you, Your Honor. Shea Bond on behalf of the Commissioner of Social Security. I think what's striking about this record, taking the physical impairments first, is that we have no opinion from any of claimant's treating providers that she had any kind of physical restrictions on her ability to do any work activity. What we do have is the state agency doctors who reviewed this record, and the two doctors who did review this record concluded that she could perform within the parameters of light work and had no restrictions on her reaching or handling capabilities. And so that's uncontradicted in the record. What I also think is striking about the record is that the record that was before the ALJ, all of the claimant's treating clinicians, they assessed her mental functioning. They listened to her description of her mental symptoms. They examined her. They provided treatment, albeit adjusted treatment, throughout the period and made certain diagnoses. But all those clinicians consistently evaluated the claimant with having a global assessment of functioning score of 70. Is the key date here March 16th or March 23rd, 2016? That's the ALJ's decision. Yeah, so that's the key date, right? Well, that's the termination date for the period under consideration. On February 12th, 2016, didn't she have a GAF of 60? So there is that notation. However, that evidence was not submitted to the ALJ. And on March 1st, 2016, was it 50? Correct. And then on March 16th, reflecting that time period, right in that same time period, was it again 50? Correct. I have never submitted that evidence to the Administrative Law Judge. So the evidence for the Administrative Law Judge for the GAF score is consistently of 70 between 2013 and I believe to the end of 2013. So what is your position on that? How did these get in? They submitted it to the District Court but not to the ALJ? So this evidence had been submitted to the Appeals Council. When the Appeals Council looked at that evidence, it determined two things. One was that some of the evidence covered a period of time that was not relevant to the ALJ's decision because it was dated thereafter. But the dates that Judge Gwynne just walked through would have been relevant, correct? The other conclusion was that the evidence would not have been sufficient to change the outcome of the ALJ's decision. But if the Appeals Council indicates it wouldn't have been sufficient to change the decision, doesn't that become part of the record we consider? Well, they didn't exhibit it, but it is evidence that's in the administrative record. Because after those dates, it gets significantly worse for her, doesn't it? She's got a 48 GAF on March 30th. She's got a 55 on April 20th. She's got a 55 on April 28th. She's got a 55 on May 12th. She's got a 55 on May 20th. She's at 55 almost consistently after that time, and it sounds like the appeals body at least looked at that before they said it would make a difference in the case. Correct. And so the GAF scores that were lower than the 70, the ones that were in the 50s, I believe that's representative of moderate symptoms. Is 48 a moderate symptom? But that was at one point on March 30th of 2016. So that's the sole GAF number in the record. So if we're looking to see if the evidence that claimants submitted to the Appeals Council would have changed the outcome of the ALJ's decision, does it disrupt the substantial evidence that was before the ALJ, it would be our position that it's not, because what was consistent throughout the record was that she did maintain these GAF scores. Let me go back, because the principal argument the appellant makes is that the ALJ gave no justification for discounting the treating physician's opinions. Correct. It just kind of gave this overall the record doesn't support it. Does the ALJ, if he's going to discount a treating physician, does he have to be specific about pointing where specifically the records undercut the treating physician? Yes, and the ALJ did that here. So the ALJ is discussing Dr. Andrews' opinion. If you look, I think it's page 126, right? Yes. He says, as to the opinions, little weight is given to the June 24, 2014 opinion of Andrews Thomas. He doesn't even know the guy's name, right? That the claimant was unable to meet the competitive standards to perform unskilled work. The extreme limitations are not supported by the claimant's mostly mild mental status examinations and conservative treatment. Moreover, he's not a mental health professional. So we know he's wrong on the mental health professional, right? Correct. And the other justification is just kind of without any specifics, the record doesn't support it. Well, I think there was a key clause that was omitted from that recitation. It was the statement that was mostly mild mental status examinations and conservative treatment as described above. And so the as described above refers to literally the above paragraph where the ALJ is discussing. Well, he doesn't give which specific conservative treatment he's relying on, though, does he? Well, it's the medications. And so she had actually said, well, this is in the paragraph. Well, are the medications she was receiving, are they conservative? We're having some trouble hearing you. Pardon. I would point out to where the state agency, who was reviewing this record, had pointed out that the claim had not had any inpatient treatment when evaluating the treatment that she had received. And so dental page 152 of our supplemental records. She's getting Xanax, right? Correct. And Lamisadol and Latuda? Correct. And as the state agency doctor had concluded, the treatment showed improvement. Well, the state examining doctor, he never examined her, though, did he? No, but this is the expert psychological consultant who reviewed this record. Did he ever talk to her or get a history from her? The state agency just reviews the records for the agency. But it's an expert opinion, and it's an opinion if you look at those... ...the types of treatment that the claimant had. What the state agency said was that it didn't... I think you've got to come closer to the mic, Ms. Bond. Or maybe it's a bigger problem. I'm sorry? We lost you, I think, for a minute. Oh. So there is no history of inpatient treatment. And so that was an example of a more aggressive form of treatment for someone with a mental impairment. Here we had somebody who was... ...but she admitted that they had helped improve the symptoms. And when she was having exacerbations of her condition, they were related to some situational factors. So, for example, she said that she was coming to a large sum of money... ...other government benefits. She also had two people close to her past the day. And so she had experienced, understandably, some increased symptomatology. Why did she get so... Can I squeeze in? I'm sorry. No, go ahead. I've been very quiet. I'd like to get in turn. I have some questions I want to ask as soon as you finish. Oh, of this... I'm finished. Go ahead, Your Honor. I have some problems with the ALJ. It seems to me that it's step two. By failing to determine whether some of Bentley's diagnosed impairments were severe or non-severe, we have a serious problem. It's the ALJ's responsibility. And then we get to step four. And step four of the findings of the ALJ, whether or not it was an incomplete hypothetical to the vocational expert, is another issue of the ALJ. Now, when this came up, the government said, well, we can fill that in. You can't fill it in. It has to be the ALJ. So the problem I have in the case, in addition to what my colleagues have been talking about, I don't see how we can go forward without sending it back to the ALJ to do the job correctly. Well, if we're talking about the additional impairments, the ALJ did find a severe hand impairment. And, again, it turned out that the DPS looking at this record found no limitations beyond that, which the ALJ... But in the government briefs, you suggest that we go ahead and do that work for the ALJ. Do we have power to do that? Well, no. But the court doesn't make fact-finding, but looks to see if this decision is supported by... Well, with the ALJ leaves it up completely. There's not much we can do to say about what the ALJ would say. And that seemed to be the thrust of the brief. And I just didn't understand that. I've been listening to these cases for quite a few years. I still don't understand the argument that if the ALJ fails to do something, that we can go ahead and substitute for the ALJ. Well, I wouldn't say that the ALJ... It would be our position that the ALJ didn't fail here. It's that the ALJ at step two found severe impairments. Now, once you go beyond step two, the ALJ would consider any limitations applying from a severe or non-severe impairment. It's our position that the remainder of the decision actually did that. And again, at the beginning, a type of severe hand impairment, the ALJ assessed a light RFC. And we had a state agency, doctors, that there's no contrary medical opinion to say that a light RFC does not... But where do you find that the ALJ determined whether some of Bentley's diagnosed improvements were severe or non-severe at step two? So, at the step two finding, there isn't a discussion of the carpal tunnel. But, in discussing evidence related to her complaints of hand pain, that covers the types of complaints that she's saying were disabling for her. So, we're saying that the impairment doesn't have to be non-severe. It doesn't have to be a misdiagnosis, as long as the types of symptoms and conditions... Well, is she... Well, at step four, there was a question whether it was an incomplete hypothetical to the vocational expert. And once more, we can't... If that's there, we can't help that to go back, right? Well, if you were to find that there was an omitted limitation, then that would be an error. But, again, it's our position that the RFC is reflective of what the evidence showed in this case. So, we had two state agency doctors who looked at this record. We found one part with no limitations on research. I understand all that. I understand all that. But the ALJ has to make some determinations. You've got a lot of people in there. I'm just wondering whether the ALJ has to be reversed to go back and cross the T's and dot the I's. Because we've got some cases that sort of look that direction. Again, I mean, if this court were looking to say that there was a harmful error here, then the appropriate type of remedy would be a remand for the proceedings. But, again, we don't concede that. We would say that the ALJ's decision is T and the hypothetical... Let me just ask. At the ALJ hearing, the claimant's attorney said she had also, and I think offered medical records, that she'd also had post-traumatic stress disorder diagnosis, borderline personality disorder, pain in the elbow, pain in the right hand. And there was evidence offered on that. But was that ever discussed in the ALJ's decision, any of those conditions? So the conditions we want, again, are specific. But it would be our position that the ALJ would discuss the symptoms that would be adverse to those conditions. I'm not sure. I'm having some trouble hearing. I don't know if you need to get closer. I apologize, Your Honor. So the ALJ's decision actually discusses the types of symptoms that would be hallmarks of those conditions, even if the ALJ did not specifically name them. And so throughout the ALJ's decision, the ALJ's... We lost you. Oh, no. Okay. Nothing at all? We got you now. Okay. So the ALJ's decision is identifying, again, the hallmarks of those other conditions, which would be rage, paranoia, difficulty concentrating on tasks, difficulty being around others, social anxiety, insomnia. All those symptoms were addressed in this decision. Does the ALJ, though, have an obligation if a condition's been recognized and supported by medical evidence? Does he have an obligation to at least include it in the overall evaluation, whether somebody can work? Well, again, it's... I would say there's no obligation to name the condition and specifically name it as long as the ALJ can show that he or she has considered the symptoms and limitations of being alleged and what was shown in the record. And so here, the ALJ did find severe mental impairment bipolar disorder, didn't stop the analysis of that, too, but then proceeded with the remainder of the sequential evaluation. At that point, that's when the ALJ would consider any symptoms or limitations from other severe impairments. And so that is what happened here, that the ALJ was considering the symptoms and limitations... It was also a little bit surprised. Let me interject just a bit. He discounts her general description of her life, right, and says she's basically able to function, right? Are you talking about the daily activities? Yeah, yeah, daily activities. So the ALJ found that the daily activities were more functional than what she was alleging that the medical evidence would show, that she was more limited than what was stated. I went through the record on that. She cooks one meal a day. She goes to the grocery store once a month for about 40 minutes because she can't handle it otherwise. She doesn't mow the yard, doesn't garden, doesn't go to church, doesn't go to movies or camping or bowling or golf, or has no hobbies, has one friend that comes over to her house, and she occasionally goes to her daughter's school functions. I mean, was there something I missed where she was out doing line dancing or something of that nature that was inconsistent with disability? Well, it shows that she was able to function. And again, it's not necessarily that it's equivalent to an eight-hour workday, but it can show that she's more functional than... Which of her descriptions do you most rely on for her ability to function in a workplace? Well, again, I wouldn't say that these activities are commensurate with being able to work in a workplace, because they don't have to. Under the case law, that's one way daily activities can be relevant, but daily activities can show some functionality. Even with some limitation, it can be relevant to show that the claimant has more function than she's alleging. Did the ALJ make a credibility finding against her? He found her statements less than credible. Or I shouldn't say credible, but less persuasive. Credible, but less persuasive. Well, they were not supported by the record, is what the ALJ was finding. All right, we're about eight and a half minutes over time. I think, you know, it is a full record. If there's any other... Judge Gwynne, if you have another question. No, thank you. Okay, okay. Counsel, I think we've gotten your answers on that and appreciate your argument. Thank you. Rebuttal, we've gone over. We'll give you a minute. We'll round it up to a minute and go ahead. Thank you, Your Honor. I just wanted to touch on a few things quickly. Obviously, because the AC did consider those records, they are part of the record that this court can rely on in connection with remanding. There also, as the court went through, the TAS scores from beforehand. But it should be remembered, and I would point the court to our excerpts of record at 40 and 41, you are talking about a woman who is cutting herself to release demons and pain. That, you know, the AC said these later records have no bearing. These are long-term, very severe, life-threatening mental impairments that this woman has. And those records and opinions are being rendered and treatment is ongoing and consistent. She's been in care since 2013, in care with this doctor for a number of years. All of that comes in. All of that is relevant. All of that is properly considered by this court. I do appreciate that the court is hesitant to issue a decision which would call for an immediate payment of benefits. But given what the precedent is here, I do think that that is a compelled result. The ALJ failed to give proper reasons for discounting the treating doctors. Those treating doctors provided opinions that said that her mental impairments were going to make it impossible for her to show up to work with sufficient frequency and regularity that she could maintain a job. That was the whole, and that was what the vocational expert testified. Okay. Thank you, counsel. Thank you. We love your argument. Thank you both. And that case is submitted, and we will now take a short recess while we prepare for the remainder of the calendar.
judges: Wallace, R. Nelson, Gwin